**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

DEANNA WARNER-GRUNAU,

       Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

CASE NO. 1:21-cv-00415

MAGISTRATE JUDGE AMANDA M. KNAPP

**MEMORANDUM OPINION AND ORDER**

       Plaintiff Deanna Warner-Grunau ("Plaintiff" or "Ms. Warner-Grunau") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned pursuant to the consent of the parties. (ECF Doc. 17.)  For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

       Ms. Warner-Grunau was found disabled from October 3, 2013 through June 6, 2016, but not disabled as of June 7, 2016, in a partially favorable decision issued on October 29, 2018. (Tr. 98.)  The 2018 decision is not the subject of this appeal.

       On January 9, 2019, Ms. Warner-Grunau filed the SSI and DIB applications that are the subject of the present appeal, alleging a disability onset date of June 7, 2016.  (Tr. 98, 409-16, 417-18.)  She asserted that she was disabled due to obesity, diabetes, depression, severe anxiety, PTSD, polycystic ovarian syndrome, infertility, hypertension, migraines, nausea, vomiting,

diarrhea, abdominal pain, abnormal vaginal bleeding, and shortness of breath. (Tr. 178, 224, 266, 284, 435.) Her applications were denied at the initial level (Tr. 265-81) and upon reconsideration (Tr. 284-95). She then requested a hearing. (Tr. 297-98.) On July 13, 2020, a hearing was held before an Administrative Law Judge ("ALJ"). (Tr. 119-45.)

On September 18, 2020, the ALJ issued an unfavorable decision, finding Ms. Warner-Grunau had not been under a disability from October 30, 2018 through the date of the decision. (Tr. 95-118.) The ALJ explained that he addressed the issue of disability beginning October 30, 2018, the day after the date of the prior final Administrative Law Judge decision. (Tr. 98.) Plaintiff requested review of the decision by the Appeals Council. (Tr. 405-08.) On December 31, 2020, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6.)

## II.    Evidence

Although Ms. Warner-Grunau has severe mental impairments that were identified by the ALJ (*see* Tr. 101) and the parties detail evidence relating to Ms. Warner-Grunau's mental health impairments (ECF Doc. 13, pp. 6-8, 10; ECF Doc. 14, pp. 7-9), her challenge in this appeal relates to the ALJ's assessment of her physical functional capacity evaluation and the ALJ's physical residual functional capacity findings. (ECF Doc. 13, pp. 11-18.) The evidence summarized herein is accordingly focused on evidence pertaining to Ms. Warner-Grunau's physical impairments and limitations.

## A.    Personal, Educational, and Vocational Evidence

Ms. Warner-Grunau was born in 1986. (Tr. 109, 409.) She was thirty years old on the alleged disability onset date. (Tr. 109.) She has a high school education, with past work as a flagger and in a composite administrative clerk / skip tracer job. (*Id*.)

**B.**      **Medical Evidence**

**1.**      **Treatment History Prior to 2018 ALJ Decision**

Ms. Warner-Grunau's treatment for her physical impairments was primarily through the Cleveland Clinic, where Philip Tomsik, M.D. was her primary care provider.  (*See generally* Tr. 901, 594-674, 924, 927, 932-36.)  In early 2016, Ms. Warner-Grunau received treatment for an adrenal mass which was possibly related to hyperaldosteronism.  (Tr. 861-62, 889, 893-96, 921.) In May 2016, she saw Maria Miklowski, M.D. for a preoperative evaluation for adrenal gland procedures.  (Tr. 904-07, 912-16.)  There, she reported being able to perform moderate work around the house like vacuuming, sweeping floors, and carrying groceries.  (Tr. 904.)  Her past medical history included hypertension, GERD, diabetes, hypothyroidism, migraines, obesity, polycystic ovarian syndrome, colitis, and depression.  (Tr. 911, 913.)  Her ECG was normal on June 6, 2016.  (Tr. 887-88.)  On June 7, 2016, Ms. Warner-Grunau's left adrenal gland was removed due to an aldosterone secreting adenoma.  (Tr. 861-62, 883.)  At a June 22, 2016 post-operative follow-up visit, Ms. Warner-Grunau reported that her post-operative pain and discomfort were improving.  (Tr. 860.)

On July 20, 2016, Ms. Warner-Grunau presented to Karen Cooper, D.O. for a weight management assessment due to morbid obesity.  (Tr. 841-44.)   She was 5' 7" and weighed 297 pounds.  (Tr. 841.)  She reported having no interest in bariatric surgery although she met the surgical criteria for it.  (Tr. 842.)  She was interested in exploring other options.  (*Id*.)  Prior weight loss efforts included self-directed dieting and consultation with a nutritionist.  (*Id*.)  Dr. Cooper suggested a few diet plans to consider.  (Tr. 844.)

On September 13, 2016, Ms. Warner-Grunau saw Dr. Tomsik for a follow-up visit regarding her blood pressure and lab work.  (Tr. 834.)   She reported feeling well overall, and

explained she had been working with her gynecologist and endocrinologist to adjust her blood pressure regimen to prepare for pregnancy.  (*Id*.)  She reported no new complaints.  (*Id*.)

On October 31, 2016, Ms. Warner-Grunau presented to the Cleveland Clinic emergency room, reporting a history of mid-abdominal pain that had radiated to the left side for four years and had worsened beyond her baseline over the past three days.  (Tr. 819.)  She reported multiple bouts of diarrhea daily for about two months and excessive vomiting over the past twenty-four hours.  (*Id*.)  She reported being concerned that she might have an ovarian cyst or an ectopic pregnancy.  (*Id*.)  A pelvic ultrasound was normal and a CT scan of the abdomen and pelvis showed no acute abdominal or pelvic process, but there was fatty infiltration of the liver and a left adnexal cyst.  (Tr. 822-23.)  She was discharged home with instructions to follow up with her primary care physician.  (Tr. 825.)

On January 4, 2017, Ms. Warner-Grunau attended a follow up with the surgical department regarding her adrenal gland surgery.  (Tr. 813.)  Dr. Eren Berber, M.D. noted "significant improvement of hypertension after adrenalectomy for primary hyperaldosteronism" and recommended follow up in a year.  (*Id*.)  Ms. Warner-Grunau reported improvement in her headaches, that she felt more active since surgery, and that she had started to lose some weight. (*Id*.)  She saw Dr. Tomsik that same day for follow up regarding her hypertension and diabetes; a notation of additional medical problems included morbid obesity, insulin resistance, depression, primary hyperaldosteronism, and status post left adrenalectomy.  (Tr. 809.)   Overall, Ms. Warner-Grunau reported doing and feeling well.  (*Id*.)  She was continuing to lose weight, her headaches had improved significantly, her blood pressure readings were fairly stable, and her glucose had been very stable.  (*Id*.)  She was informed that insurance might not cover her preferred acid reflux medication.  (*Id*.)  Her BMI was 45.37.  (Tr. 812.)  On examination, she

was in no acute distress but her affect was blunted.  (*Id*.)  There was no edema in her bilateral lower extremities and her lungs were clear.  (*Id*.)

On April 4, 2017, Ms. Warner-Grunau returned to Dr. Tomsik for follow up regarding her hypertension, diabetes, and thyroid.  (Tr. 786.)  She reported difficulty dealing with familial stressors.  (*Id*.)  She also discussed a recent pelvic surgery to remove cysts.  (*Id*.)  She did well with the surgery but did not notice a significant change in the level of her abdominal pain since her surgery.  (*Id*.)  Her blood pressure was stable and she reported no headaches, chest pain, or dizziness.  (*Id*.)  On examination, her BMI was 45.26, she was in no acute distress, her lungs were clear, and she had no edema in her bilateral lower extremities.  (Tr. 789.)

Ms. Warner-Grunau returned to Dr. Tomsik for follow up appointments in May, July, and October 2017.  (Tr. 763-67, 774-78, 779-84.)  In July, she reported some tachycardia, with her heart rates at home sometimes between 115 and 120.  (Tr. 774.)  Her blood pressure and glucose were stable in July.  (*Id*.)  When she saw Dr. Tomsik in October, she reported having "stress" and sinus headaches twice a week and requested a prescription for Cefaly, a pulse stimulator with forehead pad.  (Tr. 763.)  She reported being tired and sleeping more, especially after eating, but that her glucose had been stable.  (*Id*.)  Her tachycardia was improved as compared to her prior reports.  (Tr. 763, 767.)  During her October examination, she was in no acute distress but her affect was slightly blunted.  (Tr. 766.)  Her lungs were clear and she had no edema in the bilateral lower extremities.  (*Id*.)  Dr. Tomsik noted some very dry skin on the surface of her right foot, but she had normal sensation to monofilament throughout her feet.  (*Id*.)

On January 19, 2018, Ms. Warner-Grunau returned to Dr. Tomsik for follow up.  (Tr. 750-54.)  She reported occasional heart palpitations and her heart rate was elevated to 127 that day.  (Tr. 750.)  She said her heart rate rose with anxiety.  (*Id*.)  Her migraines were relatively

stable, but she continued to request a prescription for Cefaly. (*Id*.) On examination, she was in no acute distress, her heart was normal but tachycardic, her lungs were clear, she had no edema in her bilateral lower extremities, and she had good distal pulses in her lower extremities. (Tr. 753.) Dr. Tomsik noted that Ms. Warner-Grunau's diabetes and hypothyroidism were stable and her hypertension was benign. (Tr. 754.) She was continued on her medications. (*Id*.) The etiology of her tachycardia was not clear, but Dr. Tomsik said he would continue to monitor it. (*Id*.) He provided her with a prescription for the Cefaly device. (*Id*.)

On April 10, 2018, Ms. Warner-Grunau saw Roxana Siles, M.D. for an allergy consultation and evaluation of her immune system. (Tr. 736-40.) She reported frequent sinus infections with no seasonal component. (Tr. 736.) She reported no history of asthma but chest tightness and shortness of breath when going upstairs. (*Id*.) She was diagnosed with chronic rhinitis with recurrent sinusitis and was "reassured that her immune function [was] essentially normal." (Tr. 739.) Dr. Siles recommended that she schedule a spirometry due to shortness of breath and prescribed allergy medicine, but felt no further immune evaluation was needed. (*Id*.)

On April 18, 2018, Ms. Warner-Grunau returned to Dr. Tomsik for follow up regarding her diabetes. (Tr. 731.) She reported falling and injuring her left knee three days earlier. (*Id*.) She was applying ice to her knee to reduce her pain, but she had some flare up with activity. (*Id*.) Examination of her extremities was normal except for mild tenderness in her left knee. (Tr. 735.) Her lungs were clear and she appeared in no acute distress. (*Id*.) She had an elevated diastolic reading that Dr. Tomsik noted would be rechecked, and Dr. Tomsik planned to monitor her left knee. (Tr. 735-36.) Otherwise, her conditions were stable. (*Id*.)

On June 19, 2018, Ms. Warner-Grunau saw otolaryngologist Adnan E. Mourany, M.D., for follow up regarding her nasal congestion and sinus headaches. (Tr. 723.) Dr. Mourany noted

that her immune system was okay but she continued to report nasal discharge and blockage more

on the right.  (*Id*.)  He diagnosed chronic sinusitis, nasal congestion, and a deviated nasal septum,

and recommended that she use a hypertonic saline spray. (Tr. 726.)  Ms. Warner-Grunau

returned to Dr. Mourany on July 12, 2018, reporting that hypertonic saline spray was helping a

lot with her nasal drainage and congestion.  (Tr. 715.)  Dr. Mourany felt that her chronic sinusitis

was under control.  (Tr. 718.)  He later opined that Ms. Warner-Grunau had no limitations due to

chronic sinusitis (Tr. 1759-61.)

On July 17, 2018, Ms. Warner-Grunau returned to Dr. Tomsik for follow-up regarding

her hypertension, glucose intolerance, anxiety, and depression.  (Tr. 710.)  She reported recently

seeing her endocrinologist, who increased her thyroid medication.  (*Id*.)  She also reported seeing

an allergist who ran some tests and started her on allergy medication, which was helping.  (*Id*.)

Her sinus symptoms had improved.  (*Id*.)  Her blood pressure was stable that day.  (*Id*.)  She

inquired about bariatric surgery, stating that she had tried weight loss plans without success.

(*Id*.)  On examination, she weighed 301 pounds and had a BMI of 47.14.  (Tr. 713.)  She was in

no acute distress, her lungs were clear, and she had no edema in her lower extremities.  (*Id*.)  Dr.

Tomsik indicated that her hypertension, hyperaldosteronism, and adrenalectomy were stable.

(Tr. 714.)  Her BMI was elevated and Dr. Tomsik noted that she had been following with

reproductive endocrinology and was trying to get evaluated for a gastric sleeve procedure.  (*Id*.)

On August 17, 2018, Ms. Warner-Grunau returned to Dr. Siles for follow up.  (Tr. 704.)

She reported that the medication was helping with her congestion, but that her shortness of

breath was worse when it was hot and humid.  (*Id*.)  She also reported wheezing, chest pressure,

and shortness of breath with exertion, but said her symptoms were relieved with albuterol; she

used a rescue inhaler about once a day.  (*Id*.)  Dr. Siles ordered a methacholine test to further

evaluate her shortness of breath and assess for asthma.  (Tr. 706.)  The methacholine challenge test was negative and her baseline spirometry was normal.  (Tr. 569, 703.)  On September 5, 2018, Dr. Siles confirmed that the breathing test was negative for asthma and instructed Ms. Warner-Grunau to see a pulmonologist if her shortness of breath persisted.  (Tr. 703.)

On October 16, 2018, Ms. Warner-Grunau returned to Dr. Tomsik for follow up.  (Tr. 698.)  She reported that she continued to deal with breathing issues, felt tired and run down, was not sleeping well, had a lot of stress and anxiety, and had a low appetite.  (Tr .699.)  Her blood pressure was stable.  (*Id*.)  Her heart rate was somewhat elevated, but she denied any episodes of racing heart or palpitations.  (*Id*.)  On examination, she was in no acute distress but had a flat affect.  (Tr. 702.)  Dr. Tomsik observed a tachycardic but regular heart, clear lungs, and no edema in the bilateral extremities.  (*Id*.)  He diagnosed severe anxiety, PTSD, depression, shortness of breath, hypertension, hypothyroidism, and tachycardia.  (*Id*.)  He noted that she reported more symptoms of anxiety related to life stressors and lack of ongoing counseling.  (*Id*.)  He prescribed medication and noted she planned to reestablish with a new counselor.  (*Id*.)  He also noted that she was scheduled to see a pulmonologist for her shortness of breath, and would continue to use albuterol and an inhaler.  (*Id*.)

## 2.    Treatment History Subsequent to 2018 ALJ Decision

On November 23, 2018, Ms. Warner-Grunau had a consultation with pulmonologist Anu Suri, M.D. regarding her shortness of breath.  (Tr. 691-98.)  She reported having shortness of breath with exertion for at least five years, which had worsened over the past eight months.  (Tr. 692.)  She denied shortness of breath at rest or while sleeping.  (*Id*.)  She reported that her symptoms were worse with hot and humid weather, climbing stairs, and performing exertional activities at home.  (*Id*.)  She reported limiting herself and staying home due to breathing issues

and anxiety being in a crowd.  (*Id*.)  She reported weight gain of fifty pounds over the past five years.  (*Id*.)  She reported she could walk about half a block without getting short of breath.  (*Id*.)  She also reported using albuterol once or twice each day, which seemed to help.  (*Id*.)  On examination, Ms. Warner-Grunau was in no acute distress but morbidly obese.  (Tr. 694-95.)  She was in no respiratory distress and her breath sounds were normal.  (Tr. 695.)  Spirometry testing was normal.  (Tr. 696.)  Dr. Suri diagnosed dyspnea, unspecified type.  (Tr. 698.)  Dr. Suri suspected obesity and deconditioning were primarily contributing to Ms. Warner-Grunau's dyspnea, and strongly encouraged her to start exercising and adopt a healthy lifestyle.  (*Id*.)  Ms. Warner-Grunau was open to exploring E-coaching.  (*Id*.)  Dr. Suri instructed her to continue to use her albuterol as needed, and her nasal sprays.  (*Id*.)

On November 27, 2018, Ms. Warner-Grunau returned to Dr. Tomsik for follow-up regarding her mood and heart rate.  (Tr. 686-91.)  Her heart rate was elevated, but she admitted to consuming caffeine earlier.  (Tr. 687.)  Her blood pressure was stable.  (*Id*.)  She weighed 310 pounds with a BMI of 48.55.  (Tr. 690.)  She was in no acute distress but her affect was flat.  (*Id*.)  Her lungs were clear.  (*Id*.)  She had trace edema in her lower extremities.  (*Id*.)

On January 2, 2019, Health Coach Anne Thacker noted that Ms. Warner-Grunau had not responded to outreach to enroll her in Cleveland Clinic's Wellness eCoaching.  (Tr.  684-85.)  On February 26, 2019, Ms. Warner-Grunau returned to Dr. Tomsik for follow up regarding her blood pressure, mood, heart rate, and weight.  (Tr. 1778.)  She reported that she might have a sinus infection.  (*Id*.)  Her mood was improved and she had been using the Cefaly for her headaches and felt it "definitely help[ed]."  (*Id*.)  On examination, Ms. Warner-Grunau weighed 313 pounds with a BMI of 49.02.  (Tr. 1782.)  She was in no acute distress, her heart rate and rhythm were regular without murmur, her lungs were clear, there was no edema in her lower

9

extremities, and her diabetic foot exam was normal.  (*Id*.)  Ms. Warner-Grunau was diagnosed

with an acute upper respiratory infection.  (Tr. 1784.)  Her diabetes was controlled.  (Tr. 1783.)

Her obesity was described as Class 3 severe due to excess calories but stable.  (*Id*.)  Her

migraines and anxiety were improved.  (*Id*.)

On March 13, 2019, Ms. Warner-Grunau saw endocrinologist Ashraf Abushahin, M.D.

for follow-up.  (Tr. 1833-39.)  She reported no complaints, her blood pressure was controlled,

and her medications for thyroid disorder and diabetes were continued.  (Tr. 1833, 1839.)

On June 13, 2019, Ms. Warner-Grunau returned to Dr. Tomsik for medication

management and to discuss disability.  (Tr. 1944-52.)  She lost eleven pounds since her last visit.

(Tr. 1944.)  She reported using the Cefaly every day for about twenty to sixty minutes, stating

that it helped a lot with her migraines.  (*Id*.)  If she did not wear it her headaches worsened.  (*Id*.)

She was not taking Lipitor because she and her husband were actively trying to get pregnant.

(*Id*.)  She reported issues with her hands cramping that had been ongoing for about a year and a

half.  (Tr. 1945.)  She stated that the cramping was worse in her right hand, and was worse when

she braided her hair, did a lot of writing, or stretched her hands out.  (*Id*.)  She denied hand

weakness or numbness, but reported some mild tingling after the cramping resolved.  (*Id*.)  On

examination, she was in no acute distress but had a flat affect.  (Tr. 1950.)  She was tachycardic

but her heart examination was otherwise regular.  (*Id*.)  She had no edema in her lower

extremities.  (*Id*.)  She had a fine tremor in both hands and positive Tinel's bilaterally, worse on

the right, but brisk reflexes in her upper extremities, normal grip strength, and no atrophy, joint

swelling or abnormalities in her hands.  (*Id*.)  Dr. Tomsik noted that Ms. Warner-Grunau's

hypertension was controlled, her migraines were improved with use of the Cefaly device, her

10

anxiety, depression, and PTSD were stable.  (Tr. 1952.)  He discussed the possibility of carpal tunnel syndrome and recommended wrist splints at night.  (*Id*.)

On September 4, 2019, Ms. Warner-Grunau returned to Dr. Suri for follow up regarding her shortness of breath and asthma.  (Tr. 2023.)  She reported no asthma exacerbations since her last visit, and reported that a new medication seemed to have helped with her symptoms.  (*Id*.)  She continued to report exertional dyspnea that was worse with hot and humid weather and some chest heaviness at times, but no chest pain.  (*Id*.)  Her weight was 307 pounds with a BMI of 48.19.  (Tr. 2024.)  Otherwise, her examination findings were normal.  (*Id*.)  Dr. Suri indicated that Ms. Warner-Grunau's asthma was stable, with a good response to medication and reduced need to use albuterol.  (*Id*.)  Dr. Suri also indicated that her dyspnea was "likely contributed by her morbid obesity" and discussed lifestyle modifications.  (*Id*.)  Ms. Warner-Grunau expressed openness to health e-coaching and a functional medicine evaluation.  (*Id*.)

During a September 12, 2019 physical examination performed in connection with a scheduled hysteroscopy, Ms. Warner-Grunau reported a history of weekly migraine headaches that she controlled with a TENS unit.  (Tr. 1970-71, 1978.)  She reported that her mild asthma symptoms were worse when it was hot and humid, she used albuterol as needed, and she used an inhaler daily.  (Tr. 1978.)  Her diabetes was stable and her blood pressure was controlled with medication.  (*Id*.)

On December 12, 2019, Ms. Warner-Grunau met with Dorota Whitmer, M.D. in endocrinology for a BMI medical consultation.  (Tr. 2259-66.)  Her weight was 300 pounds with a BMI of 46.99.  (Tr. 2259.)  Dr. Whitmer planned to refer Ms. Warner-Grunau to a nutrition team to try to identify a dietary program that she felt comfortable with.  (Tr. 2266.)  She recommended that Ms. Warner-Grunau become more physically active.  (*Id*.)

On January 13, 2020, Ms. Warner-Grunau saw Dr. Siles for follow up regarding her allergies and immune system.  (Tr. 2155.)  Ms. Warner-Grunau reported about fifty percent improvement with her medications.  (*Id*.)  She reported being under the care of Dr. Suri for her shortness of breath.  (*Id*.)  She was taking medication for shortness of breath despite a negative methacholine test, and reported continued shortness of breath on exertion when going up and down stairs or if it was hot outside.  (*Id*.)  She reported using her rescue inhaler about twice a day, which she said was better than in the past.  (*Id*.)  Except for her BMI and an erythematous patch on her left arm, her physical examination findings were normal.  (Tr. 2158.)

On January 20, 2020, Ms. Warner-Grunau returned to Dr. Tomsik and reported "a 'flare'" of left ankle pain.  (Tr. 2195.)  She described a left ankle injury from about five years earlier, but reported no recent ankle injury.  (*Id*.)  On examination, she had no edema in her lower extremities.  (Tr. 2200.)  Dr. Tomsik noted some discoloration, tenderness, "boggy edema," and pain in the left ankle and foot, but no instability.  (*Id*.)  He also noted some light erythema in her left arm, but no warmth or tenderness.  (*Id*.)  She exhibited positive Tinel's signs and reported cramping of her hands.  (Tr. 2201.)  Her mild intermittent asthma was stable. (*Id*.) Dr. Tomsik recommended a physical therapy consult for her hands, a dermatology consult for erythema and skin lesions, and an x-ray of her ankle.  (*Id*.)  The x-ray of the ankle showed no fracture or dislocation and her ankle mortise was maintained.  (Tr. 2258.)

On March 13, 2020, Ms. Warner-Grunau returned to Dr. Suri for a follow-up appointment.  (Tr. 2306.)  She reported no asthma exacerbations since her last visit and no wheezing, postnasal drip, or phlegm. (*Id*.)  She reported that her chronic dyspnea was unchanged and she had an occasional tickle in her throat.  (*Id*.)  Examination findings were normal.  (*Id*.) Dr. Suri indicated that Ms. Warner-Grunau's asthma was stable and her dyspnea was "likely

contributed by her morbid obesity." (Tr. 2308.)  Dr. Suri noted that Ms. Warner-Grunau had

started seeing Dr. Whitmer and was following with a nutritionist. (*Id*.)

On March 18, 2020, Ms. Warner-Grunau had a telephone visit with Romina Yee, a

registered dietitian to discuss a diet plan. (Tr. 2296-2300.)  Ms. Warner-Grunau reported that

she had tried different diets in the past without success. (Tr. 2299.)  She was not interested in a

diet or meal plan, but was interested in a prescription for an appetite suppressant. (*Id*.)  Ms. Yee

explained to Ms. Warner-Grunau that registered dietitians could not write prescriptions for

appetite suppressants. (*Id*.)

On April 20, 2020, Ms. Warner-Grunau had a telemedicine visit with Dr. Tomsik. (Tr.

2326.)  She reported following with Dr. Whitmer in endocrinology and starting on an injectable

for her diabetes. (*Id*.)  She reported tolerating the medication, noticing a decrease in her appetite,

and noticing that her clothing was looser than in the past. (*Id*.)  Her conditions were generally

stable. (Tr. 2330-31.)

### 3.  Opinion Evidence

#### a.  Physical Residual Functional Capacity Assessment

Ms. Warner-Grunau presented for a Physical Residual Functional Capacity Assessment

on February 28, 2020, which was performed by Brett Balis, PT, DPT at the Cleveland Clinic

Rehabilitation and Sports Therapy upon Dr. Tomsik's referral. (Tr. 2161-70.)

PT Balis opined that Ms. Warner-Grunau demonstrated the ability to perform sedentary

work and was "presently able to work full time while taking into account her need to alternate

sitting and standing," but "the unskilled sedentary occupational base [was] significantly eroded"

because she could not power lift or carry bilaterally ten pounds or slightly less, stand for one

hour and forty-five minutes, and sit at least two hours at a time. (Tr. 2161.)  She could lift five

pounds to below waist height and five pounds to shoulder height, she could carry five pounds, and could push and pull seven pounds.  (Tr. 2161, 2162.)  She could occasionally reach forward and above her shoulders, bend, perform fine and gross coordination, pinch, perform simple grasping, and walk.  (*Id*.)  PT Balis also opined that she should avoid firm grasping and squatting.  (*Id*.)  PT Balis also indicated that Ms. Warner-Grunau could work full time with the ability to sit eight hours and thirty-nine minutes total and stand one hour and twenty-six minutes total in a day. (Tr. 2162, 2170.)

On examination, Ms. Warner-Grunau exhibited functional cervical range of motion but her lumbar range of motion was limited.  (Tr. 2166.)   Her lower extremity range of motion was within normal limits.  (*Id*.)  She showed some reduced (4/5) strength bilaterally with hip flexion, knee flexion and extension, and ankle dorsiflexion.  (*Id*.)  Otherwise, her lower extremity strength was within normal limits.  (*Id*.)  Her range of motion was limited in her shoulders and she exhibited some reduced (4/5) strength in her shoulders and with elbow flexion and extension. (Tr. 2167.)  Otherwise, her upper extremity range of motion and strength were within normal limits, including in her hands bilaterally.  (*Id*.)  Ms. Warner-Grunau reported an increase in her pain symptoms and fatigue during portions of her examination.  (Tr. 2168-70.)   Her ability to climb stairs was not tested but she reported having steps in her home and negotiating them by taking one at a time and using a handrail.  (Tr. 2170.)  She also reported that she often needed to take a rest on the landing due to fatigue.  (*Id*.)

### b.  State Agency Reviewing Medical Consultants

On initial review, on May 17, 2019, state agency reviewing medical consultant Bradley J. Lewis, M.D. adopted the prior ALJ's October 29, 2018, RFC findings and opined that Ms. Warner-Grunau had the physical RFC to:

- lift and/or carry twenty pounds occasionally and ten pounds frequently;

- stand and/or walk a total of four hours and sit a total of four hours and must periodically alternate sitting and standing to relieve pain and discomfort;[1]

- never climb ladders, ropes, or scaffolds;

- occasionally stoop, kneel, and crouch;

- frequently climb ramps and stairs and crawl; and

- avoid all exposure to hazards.

(Tr. 190-92, 211-13.)

At the reconsideration level, on July 10, 2019, state agency reviewing medical consultant William Bolz, M.D. agreed with the findings of Dr. Lewis.  (Tr. 234-36, 253-55.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the July 13, 2020, hearing, Ms. Warner-Grunau testified in response to questioning by the ALJ and her counsel.  (Tr. 123-38.)  She stated she could not work because she did not have a lot of overall strength, explaining that she could not lift more than eight to ten pounds.  (Tr. 124.)  She also stated she had a hard time grabbing items with her hands due to numbness.  (*Id*.)  She stated that she lost a lot of her strength after her adrenal gland was removed, and that carpal tunnel syndrome was the cause of numbness in her hands.  (Tr. 125.)  She reported wearing a wrist splint at night on her right hand, which was worse than her left.  (*Id*.)  The splint helped a little but she still had numbness.  (*Id*.)  Her doctors had not suggested carpal tunnel surgery.  (*Id*.)

---

[1] The adjudicator did not provide a basis for the need to alternate between sitting and standing and did not include any statement as to the frequency with which Ms. Warner-Grunau would be required to alternate.  (Tr. 190-92, 211-13.)  The prior ALJ's RFC finding, which the adjudicator stated he was adopting, did not include a specific limitation requiring the ability to alternate between sitting and standing.  (Tr. 156, 165.)  Neither parties' statement of the medical evidence notes that the state agency medical consultants opined that Ms. Warner-Grunau would need the ability to alternate between sitting and standing.

Ms. Warner-Grunau testified to being five feet seven inches tall and weighing 277.6 pounds. (Tr. 126.) She stated that her weight was trending down due to a new injectable medication. (Tr. 127.) She reported on a typical day she woke up, grabbed breakfast, and took her medications. (Tr. 124.) She would then fall back asleep, which allowed her stomach time to adjust to the medication; her medication often upset her stomach and caused her to be in the bathroom. (Tr. 124, 128.) She estimated being in the bathroom eight or nine times a day for about ten minutes to an hour. (Tr. 128.) She reported that her stomach issues were related to the problems with her adrenal gland. (Tr. 129.) She reported having an excessive need for sleep, which she attributed to medication side effects and having only one adrenal gland. (*Id*.)

Ms. Warner-Grunau reported not being able to help much with chores around the house because the laundry was in the basement, she was not able to carry clothes down the stairs, and she could not put pressure on her stomach to load the laundry in the top loader washer. (Tr. 129.) She reported not being allowed to help with cleaning dishes because she had dropped dishes in the past. (Tr. 129-30.) She reported being able to bathe and dress herself with minimal assistance from her husband. (Tr. 130.) She was able to drive, but reported driving only to places that she was familiar with and only if she was not too tired. (Tr. 131.) She reported having difficulty focusing due to being tired and not being a good multi-tasker. (Tr. 131-32.)

Ms. Warner-Grunau stated she lived with her in-laws, so she saw them all the time. (Tr. 131.) She kept in touch with her sisters and talked to a few friends and family members on Facebook. (*Id*.) Otherwise, she stayed home and kept to herself. (*Id*.)

Ms. Warner-Grunau explained that she had to check her blood pressure and sugar a couple of times each day. (Tr. 135-36.) Her migraines had gotten to the point where she had to go to her bedroom with no lights and stay away from odors. (Tr. 137.) She explained that she

16

used a device with electrodes at least once a day for about an hour to help relieve her migraines. (*Id.*) She reported taking only over-the-counter pain relievers for her migraines for insurance reasons, and because certain other medications would interfere with medications she was already taking. (Tr. 137-38.) She reported having chronic diarrhea; she took medication for this impairment, but she could still be in the bathroom for up to an hour. (Tr. 138.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. (Tr. 139-44.) The VE classified Ms. Warner-Grunau's past work as follows: administrative assistant – sedentary, skilled position; medical billing clerk – sedentary, semi-skilled position; waitress/server – light, semi-skilled position; and toll cashier – light, unskilled position. (Tr. 139.) The ALJ asked the VE whether Ms. Warner-Grunau's past work or any other jobs would be available for an individual of the same age and with the same education and vocational background as Ms. Warner-Grunau with the ability to:

> lift, carry, 20 pounds occasionally, 10 pounds frequently; can stand/walk four out of eight; can sit four out of eight. No limit on push, pull, or foot pedal. This person can frequently use a ramp or a stairs but never a ladder, rope, or scaffold; can constantly balance; occasionally stoop, kneel, and crouch and frequently crawl. There are no manipulative limitations, no visual deficits, no [indiscernible] limits.
>
> This person should avoid high concentrations of heat, smoke, fumes, pollutants, and dust and must avoid, entirely, dangerous machinery and unprotected heights.
>
> This person can do complex and simple, routine tasks. The tasks, however, should be low stress, and I define that to mean to high production quotas or piece rate work. And, finally, this first person should have only superficial and occasional interactions with public, peers, and supervisors, and I define superficial to mean no arbitration, confrontation, negotiations, or supervision or commercial driving.

(Tr. 140 (alteration in original).) The VE testified that the described individual could not perform Ms. Warner-Grunau's past work, but that there would be light exertional jobs available, including hand packager, small products assembler, and visual inspector checker. (Tr. 140-41.)

For his second hypothetical, the ALJ asked the VE to assume the first hypothetical except the individual could lift/carry 10 pounds occasionally and frequently, sit six out of eight, and stand/walk two out of eight.  (Tr. 141.)  The VE testified that the described individual could not perform Ms. Warner-Grunau's past work but there would be sedentary jobs available, including bench hand, final assembler, and clerical sorter.  (Tr. 141-42.)

Ms. Warner-Grunau's counsel asked the VE whether jobs would remain in response to the ALJ's first or second hypothetical if there was no firm grasping and occasional simple grasping, meaning only occasional fine manipulation.  (Tr. 142.)  The VE indicated that there would be no jobs available in either instance.  (*Id.*)  The VE also testified that there would be no work available if the individuals as originally described in the first or second hypotheticals needed two additional thirty-minute breaks, were off task twenty percent of the time, or would be absent three times a month.  (Tr. 142-43.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

## IV.  The ALJ's Decision

In his September 18, 2020, decision, the ALJ made the following findings:[3]

1.  The claimant meets the insured status requirements through December 31, 2019.  (Tr. 100.)

2.  The claimant has not engaged in substantial gainful activity since June 7, 2016, the alleged onset date.  (*Id*.)

3.  The claimant has the following severe impairments: obesity, chronic bronchitis, anxiety disorder, depressive disorder, and posttraumatic stress disorder.  (Tr. 101.)

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 101-03.)

5.  The claimant has the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except she: can constantly push, pull, and operate foot pedals; can frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds; can constantly balance, but only occasionally stoop, kneel, and crouch; can frequently crawl; must avoid high concentrations of heat, smoke, fumes, pollutants, and dusts; must avoid all exposure to dangerous machinery or unprotected heights; can perform complex tasks and simple, routine tasks involving low-stress work, meaning no high production quotas or piece rate work; can have superficial and occasional interactions with the public, peers, and supervisors, meaning no arbitration, confrontation, negotiation, or supervision or commercial driving.  (Tr. 103-09.)

6.  The claimant is unable to perform any past relevant work. (Tr. 109.)

7.  The claimant was born in 1986 and was 30 years old, defined as a younger individual age 18-44, on the alleged disability onset date.  (*Id*.)

8.  The claimant has at least a high school education.  (*Id*.)

9.  Transferability of job skills is not material.  (*Id*.)

10.  Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (Tr. 109-10.)

---

[3] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined that Ms. Warner-Grunau had not been under a disability from October 30, 2018, through the date of the decision.  (Tr. 110.)

## V.      Plaintiff's Arguments

Ms. Warner-Grunau argues that: (1) the ALJ erred in assessing the persuasiveness of the opinion evidence, in particular the opinion of Brett Balis, PT; and (2) the ALJ's assignment of RFC limitations was not supported by substantial evidence.  (ECF Doc. 13, pp. 1, 11-18.)

## VI.      Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if a preponderance of evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'")(quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    First Assignment of Error: Whether ALJ Erred in Finding Medical Opinion of Brett Balis, PT to be Minimally Persuasive**

In her first assignment of error, Ms. Warner-Grunau challenges the ALJ's evaluation of the PT Balis' medical opinion, as set forth in his February 28, 2020 Physical Residual Functional

Capacity Assessment ("PRFC Assessment").  (ECF Doc. 13, pp. 11-16.)  The ALJ found the opinion "minimally persuasive" and explained his findings.  (Tr. 108-09.)  Ms. Warner-Grunau argues those explanations were not supported by substantial evidence, and that the ALJ did not build a logical bridge to support his findings.  (ECF Doc. 13, pp. 11-16.)  The Commissioner contends that the ALJ properly evaluated the opinion evidence.  (ECF Doc. 14, pp. 19-24.)

The ALJ provided the following explanation in support of his finding that PT Balis' opinion was "minimally persuasive":

> I find the February 28, 2020 residual functional capacity assessment of the claimant, concluding she could perform less than a full range of sedentary work with the need to alternate between sitting and standing, minimally persuasive. [citations omitted]. The physical therapist also concluded that the sedentary occupational based is significantly eroded because the claimant is unable to power lift 10-pounds or slight less, carry 10-pounds of slightly less bilaterally, stand for 1 hour and 45 minutes, and sit at least 2 hours at one time. [citations omitted] First, I note that determinations regarding disability are reserved for the Commissioner and, pursuant to 20 CFR 404.1520b(c), I am not required to articulate the consideration given to such opinions. Secondly, I find this opinion is consistent with the claimant's presentation during the functional capacity assessment, but unsupported by her treatment records, which indicate normal range of motion, sensation, motor function, and no concerns of balance issues, peripheral weakness, paresthesia, numbness, joint pain, swelling, or erythema. [citations omitted] It is also unsupported by the claimant's negative ankle x-ray. [citations omitted] I also note this opinion is less persuasive because the examiner based some of his conclusions on the claimant's subjective responses to the examiner's questions, rather than solely on objective testing. [citations omitted] Furthermore, the examiner's conclusion regarding the erosion of sedentary work is inconsistent with his finding that the claimant could sit up to 8 hours and 39 minutes total during a workday, which exceeds the requirements for sedentary exertion. (Id.). Thus, although I considered this opinion, in combination with the above-referenced objective findings, I nevertheless find it minimally persuasive.

(Tr. 108-09 (emphasis added).)

In challenging this explanation, Ms. Warner-Grunau contends the ALJ specifically erred in making the following findings: (1) "determinations regarding disability are reserved for the Commissioner"; (2) PT Balis' conclusion regarding the erosion of sedentary work is inconsistent

with his finding that Ms. Warner-Grunau "could sit up to 8 hours and 39 minutes total during a workday, which exceeds the requirements for sedentary exertion"; (3) the opinion is consistent with Mr. Warner-Grunau's presentation during PT Balis' assessment, but is unsupported by her treatment records; and (4) the opinion is less persuasive because some conclusions were based on subjective reports, not solely on objective testing.  (*See* ECF Doc. 13, p. 13 (citing Tr. 108-109).) Each of these arguments are addressed in turn below.

### 1.    Determinations Regarding Disability are Reserved for the Commissioner

Ms. Warner-Grunau first challenges the ALJ's observations that "determinations regarding disability are reserved for the Commissioner" and that ALJs are "not required to articulate the consideration given to such opinions."  (ECF Doc. 13, p. 13.)  She contends PT Balis did not opine on the issue of disability but instead "concluded, based on examination and testing, that the evidence established that Plaintiff was capable of less than a full range of sedentary work."  (*Id*.)

Under SSA regulations, statements as to whether a claimant is "disabled" or "able to work" are "inherently neither valuable nor persuasive." 20 C.F.R. § 404.1520b(c)(3).   In this case, PT Balis opined that Ms. Warner-Grunau was "presently able to work full time while taking into account her need to alternate sitting and standing" but "the unskilled sedentary occupational base [was] significantly eroded" by limitations in her ability to lift, carry, sit, and stand.  (Tr. 2161.)  His statements regarding the erosion of the occupational base and the ability to work full time are appropriately characterized as opinions relating to the ultimate issue of disability, and are thus neither valuable nor persuasive.  Accordingly, the undersigned finds the ALJ did not err in refusing to articulate how he considered those findings in evaluating the persuasiveness of PT Balis' opinion.

24

### 2.    ALJ Appropriately Considered Inconsistencies in Occupational Findings

In addition to noting that he need not discuss determinations regarding disability, the ALJ observed that PT Balis' conclusion regarding the erosion of sedentary work was inconsistent with his finding that Ms. Warner-Grunau could sit for longer than an eight-hour workday.  (Tr. 108-09.)  Ms. Warner-Grunau argues this observation was harmful error because an ability to sit for more than eight hours "does not make you capable of light exertion work," and because adoption of all of PT Balis' proposed limitations would "eliminate work at the sedentary level." (ECF Doc. 13, p. 16.)  But the Commissioner correctly observes that the ALJ adopted a sedentary RFC, not a light one, and that the relevant comment accurately highlighted an inconsistency in the opinion findings.  (ECF Doc. 14, p. 21, n. 8.)

PT Balis opined that Ms. Warner-Grunau's ability to work full time must "tak[e] into account her need to alternate sitting and standing," and that "the unskilled sedentary occupational base is significantly eroded" in part because she is "unable" to "sit at least 2 hours at one time." (Tr. 2161, 2163.)  However, PT Balis also opined: "Based on sitting observation and taking into account full time work she is able to perform sitting for up to 8 hours and 39 minutes total during a work day."  (Tr. 2170.)  A stated ability to sit for longer than an eight-hour workday does not appear to be consistent with a finding that the occupational base was eroded due to an inability to sit for at least two hours at a time.  The undersigned accordingly finds that the ALJ did not err in observing that PT Balis' opinion as to the erosion of the occupational basis was inconsistent with his finding that Ms. Warner-Grunau for sit for longer than an eight-hour workday.

### 3.    ALJ's Analysis of Consistency and Supportability Was Supported by Substantial Evidence and a Logical Bridge

Ms. Warner-Grunau next challenges the ALJ's finding that "the opinion *is consistent with claimant's presentation*, but unsupported by her treatment records." (ECF Doc. 13, p. 13

(emphasis in brief).)  She asserts that the consistency between PT Balis' opinion and her presentation at the PRFC Assessment "should weigh in favor of finding the opinion persuasive," but that the ALJ instead "undermine[d] this finding by asserting that the [assessment] is not supported by her treatment records."  (*Id.*)  She further argues the ALJ engaged in improper cherry-picking by "fail[ing] to address the evidence in the record which *does* support" her presentation at the PRFC Assessment.  (*Id.* at p. 14 (emphasis in brief).)

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and

nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2). In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.

In assessing supportability and consistency, the ALJ observed:

> I find this opinion is consistent with the claimant's presentation during the functional capacity assessment, but unsupported by her treatment records, which indicate normal range of motion, sensation, motor function, and no concerns of balance issues, peripheral weakness, paresthesia, numbness, joint pain, swelling, or erythema. … It is also unsupported by the claimant's negative ankle x-ray.

(Tr. 108 (citing Tr. 683, 1782, 1808, 1976, 2007, 2158, 2200, 2226, 2250, 2258, 2320).) Ms. Warner-Grunau's argument that the ALJ "undermine[d]" his finding that her presentation at the assessment was consistent with PT Balis' opinion (supportability) by observing that the opinion was not supported by her treatment records (consistency) mistakes the analysis the ALJ was required to make.[4] (ECF Doc. 13, p. 13.) The ALJ was required to explain how he considered both supportability and consistency. In doing so, it was appropriate for him to comparatively observe that PT Balis' findings were supported by his objective observations during the one-time PRFC Assessment but inconsistent with the objective findings and subjective complaints reflected in her actual treatment records from January 2019 through May 2020. (Tr. 108 (citing Tr. 683, 1782, 1808, 1976, 2007, 2158, 2200, 2226, 2250, 2258, 2320).)

Ms. Warner-Grunau also argues that the ALJ's consistency analysis was improper because he "fail[ed] to address the evidence in the record which *does* support" her presentation at the PRFC Assessment. (ECF Doc. 13, p. 14 (emphasis in brief).)

---

[4] It does not matter that the ALJ used the term "consistent with" in discussing supportability and "unsupported by" in discussing consistency (Tr. 108), as he adequately explained how he considered the two factors.

As a threshold matter, the undersigned notes the ALJ was not "required to discuss each piece of data in [his] opinion, so long as [he] consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).  He was also permitted to rely on information articulated earlier in the decision to support his persuasiveness determination, and was not required to rearticulate that information the opinion discussion.  *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need to require the ALJ to "spell out every fact a second time").

Of course, an ALJ may not cherry pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *See, e.g., Gentry v. Comm'r*, 741 F.3d 708, 724 (6th Cir. 2014); *Minor v. Comm'r*, 513 F. App'x 417, 435 (6th Cir. 2013).  However, "an ALJ does not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to a claimant's position." *Solembrino v. Astrue*, No. 1:10–cv–1017, 2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011).  Indeed, the Sixth Circuit has explained that allegations of cherry-picking evidence by the ALJ are "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. Apr. 3, 2014) (citing *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir. 2009)).

In support of her argument that the ALJ failed to address evidence which supported the opinion findings, Ms. Warner-Grunau argues that the record "documents a 'long history of hand

problems' including fine tremor in both hands and positive Tinel's findings bilaterally." (ECF Doc. 13, p. 14 (citing Tr. 1950, 2201).)  She asserts that "[t]hese hand problems directly support the FCE's lifting and hand manipulation restrictions disputed by the ALJ." (*Id*.)  She also cites to examination findings "which documented discoloration, tenderness, boggy edema, and pain; while left arm examination also showed erythema of the left anterior cubital fossa and along the distal arm" and evidence of a history of migraine headaches which continued despite treatment with a Cefaly device every day for up to one hour.  (*Id*. (citing Tr. 1944, 1978, 2200).)

Contrary to Ms. Warner-Grunau's arguments, a review of the ALJ decision reveals that he did acknowledge and consider evidence she contends was ignored.  The ALJ acknowledged evidence regarding hand cramping, stating "I considered the potential effect of the claimant's obesity as a contributing factor to her pain, <u>hand cramping</u>, fatigue, shortness of breath . . . and inability to tolerate hazards when arriving at the above limitations."  (Tr. 106 (emphasis added).)  The ALJ cited to multiple records when discussing this evidence, including a June 2019 treatment record from Dr. Tomsik that detailed Ms. Warner-Grunau's hand cramp complaints.  (Tr. 106 (citing Tr. 1945).)  Dr. Tomsik did note a fine tremor in Ms. Warner-Grunau's hands, positive Tinel's signs, and a recommendation for wrist splints, but he also documented evidence of brisk reflexes in the upper extremities, normal grip strength and no atrophy, joint swelling, or abnormalities in the hands.  (Tr. 1950, 1952.)  Additionally, while she claims that her hand problems caused limitations beyond those included in the ALJ's RFC, she acknowledged during her hearing that her doctors had not recommended carpal tunnel surgery and her wrist issues were secondary to her other issues, stating "the wrist has kind of taken a backseat a little bit because of everything else."  (Tr. 125-26.)

Ms. Warner-Grunau also asserts that the ALJ ignored findings of "discoloration, tenderness, boggy edema, and pain." (ECF Doc. 13, p. 14 (citing Tr. 2200).) These findings were noted during a January 20, 2020 office visit with Dr. Tomsik and related to her left ankle. (Tr. 2200.) During that visit, Ms. Warner-Grunau reported a history of a left ankle/fibular fracture from five years earlier and a recent "flare" of left ankle pain with associated swelling for about two weeks. (Tr. 2195.) Dr. Tomsik ordered an ankle x-ray, which the ALJ accurately noted to be negative. (Tr. 108, 2202, 2258.) The exam findings from the January 20, 2020 office visit also documented no instability. (Tr. 2200.) Thus, while the ALJ did not specifically describe the exam findings for Ms. Warner-Grunau's acute flare of ankle pain, he did consider her ankle injury and properly noted a lack of objective test results to support more restrictive functional limitations.

Ms. Warner-Grunau also highlights another examination finding from the January 20, 2020 visit with Dr. Tomsik that she contends was error for the ALJ not to address. (ECF Doc. 13, p. 14.) She points to the left arm examination from that visit that "showed erythema of the left anterior cubital fossa and along the distal arm." (ECF Doc. 13, p. 14 (citing Tr. 2200).) A review of the record shows that the description of the erythema was relatively benign, i.e., "general light erythema . . ." with no warmth or tenderness. (Tr. 2200.) Additionally, Ms. Warner-Grunau fails to show how these finding support more restrictive RFC limitations and fails to demonstrate that the ALJ's decision is unsupported by substantial evidence. *See Jones*, 336 F.3d at 477 (indicating courts cannot overturn the Commissioner's decision "so long as substantial evidence … supports the conclusion reached by the ALJ").

Ms. Warner-Grunau additionally asserts that the ALJ did not consider evidence showing a history of migraines that continued notwithstanding daily use of a Cefaly machine for up to one

hour a day.  (ECF Doc. 13, p. 14.)   A review of the record does not support her claim.  The ALJ

acknowledged that Ms. Warner-Grunau claimed an inability to work in part due to migraines.

(Tr. 104.)  The ALJ also specifically discussed Ms. Warner-Grunau's request for and use of a

Cefaly device to treat her migraines, observing that she "reported the device 'definitely' helped

her symptoms, which suggests her migraines were not as debilitating as alleged."  (Tr. 105.)

The records cited by and considered by the ALJ regarding Ms. Warner-Grunau's migraines

include February 26, 2019 and June 13, 2019 office visits with Dr. Tomsik, documenting her

reports that the Cefaly unit helped relieve her migraines and that she was using it about 20-60

minutes every day.  (Tr. 1778, 1944.)   Thus, the ALJ did not ignore evidence relating to her

migraines and related treatment regimen.

Ms. Warner-Grunau also argues that "the ALJ chose, instead, to rely upon the opinion of

a non-treating, non-examining state agency physician who did not have the benefit of reviewing

the entire record in determining capacity."  (ECF Doc. 13, p. 15.)[5]  However, the ALJ found

those state agency medical opinions only "somewhat persuasive," explaining:

> I specifically considered the consultants' familiarity with the evidence in the file as
> well as their program knowledge. First, I find the reduction to four hours of standing
> and walking is more consistent with the requirements for sedentary exertion.
> Nonetheless, I find the postural and environmental limitations are consistent with
> and supported by the claimant's obese state, pain allegations, and occasional
> migraines and abdominal discomfort. However, I further considered her chronic
> bronchitis and allegations of shortness of breath, in combination with her obese
> state, when further limiting her to reduced sedentary exertion with restricted
> exposure to high concentrations of heat, heat, smoke, fumes, pollutants, and dusts.
> I find these added restrictions support the claimant's impairments.

(Tr. 108 (citations omitted).)   The ALJ did not adopt the medical consultants' opinions

wholesale or fail to consider the entirety of the record.  Indeed, he added additional restrictions

---

[5] To the extent she seeks to argue that the ALJ erred in assessing the persuasiveness of the state agency opinions,
the underdeveloped argument is deemed waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997).

beyond those included in the opinions. Thus, Ms. Warner-Grunau has failed to demonstrate that the ALJ's findings as to the state agency medical consultants demonstrate any error.

After considering the ALJ decision as a whole, it is clear that the ALJ adequately articulated how he considered the supportability and consistency factors, and cited to specific evidence to support his determination. (Tr. 108.) Ms. Warner-Grunau has not argued or shown that the ALJ mischaracterized the treatment records. She argues only that the ALJ ignored evidence and/or that there is other evidence that supports a different finding. However, as explained above, the ALJ did not disregard evidence favorable to Ms. Warner-Grunau's position or focus only on a single piece of evidence, and was not required to discuss every piece of evidence. *See Boseley*, 397 F. App'x at 199. It is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence," *Garner*, 745 F.2d at 387, and the undersigned finds that the ALJ did not err in explaining or considering the supportability and consistency factors.

### 4. ALJ Appropriately Addressed Consideration of Subjective Complaints

Ms. Warner-Grunau also argues it was improper for the ALJ to find PT Balis' opinion "less persuasive" simply because he based some opinion findings on subjective reports and not solely on objective testing. (ECF Doc. 13, p. 13.)

It is well-established that "an ALJ is not required to accept a claimant's subjective complaints." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Further, "[t]he Sixth Circuit has repeatedly upheld an ALJ's decision to discount a treating physician's opinion that appears to be based on a claimant's subjective complaints, without sufficient support from objective medical data." *Livesay v. Comm'r of Soc. Sec.*, No. 17-CV-14214, 2019 WL 1503135, at *6 (E.D. Mich. Feb. 1, 2019) (citing *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391 (6th Cir. 2004); *Tate v. Comm'r of Soc. Sec.*, 467 F. App'x 431, 433 (6th Cir. 2012); *Poe v. Comm'r*

*of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009)), *report and recommendation adopted*, No. 17-14214, 2019 WL 1198700 (E.D. Mich. Mar. 14, 2019); *see also Crofutt v. Comm'r of Soc. Sec.*, No. 2:13-CV-706, 2015 WL 964113, at *15 (S.D. Ohio Mar. 4, 2015) (citing *Ferguson v. Comm'r of Soc. Sec.,* 628 F.3d 269, 273–74 (6th Cir. 2010)).

In assessing the persuasiveness of PT Balis' PRFC Assessment, the ALJ found that the "opinion [was] less persuasive because the examiner based <u>some</u> of his conclusions on the claimant's subjective responses to the examiner's questions, rather than solely on objective testing." (Tr. 108 (emphasis added) (citing Tr. 2170).)) A review of the PRFC Assessment report reflects that the ALJ's observation is accurate. (Tr. 2170.) For instance, stair climbing was not objectively tested. (*Id*.) Also, there were notations of Ms. Warner-Grunau's subjective reports of increased pain symptoms during or following testing. (Tr. 2165-70.) Although the PRFC Assessment contained objective testing, the ALJ accurately observed that the assessment was based in part on Ms. Warner-Grunau's subjective allegations. It was therefore appropriate for the ALJ to find the opinion less persuasive because some findings were not supported by objective medical evidence. Further, as detailed above, this finding was not the sole basis upon which the ALJ found the opinion minimally persuasive.

Considering the totality of record, the Court finds that the ALJ properly considered the supportability and consistency of PT Balis' opinion and explained his decision sufficiently to allow this Court to conduct a meaningful review of his persuasiveness determination. The Court accordingly finds Ms. Warner-Grunau's first assignment of error is without merit.

## C.    Assignment of Error Two: Whether RFC is Supported by Substantial Evidence

In her second assignment of error, Ms. Warner-Grunau argues that the RFC assessment is not supported by substantial evidence. (ECF Doc. 13, pp. 16-18.) The Commissioner argues in

response that the ALJ reasonably determined that Ms. Warner-Grunau could perform a limited range of sedentary work.  (ECF Doc. 14, pp. 13-18.)

A claimant's "residual functional capacity is the most [she] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing See 20 C.F.R. §§ 404.1546(c), 416.946(c)).  An ALJ assesses a claimant's "residual functional capacity based on all the relevant evidence in [the] case record."  20 C.F.R. § 404.1545(a)(1).  "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."  *Poe*, 342 F. App'x at 157.

Here, the ALJ found Ms. Warner-Grunau had the RFC to perform sedentary work with the following additional limitations:

- can constantly push, pull, and operate foot pedals;

- can frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds;

- can constantly balance, but only occasionally stoop, kneel, and crouch;

- can frequently crawl;

- must avoid high concentrations of heat, smoke, fumes, pollutants, and dusts;

- must avoid exposure to dangerous machinery or unprotected heights;

- can perform complex tasks and simple, routine tasks involving low-stress work, meaning no high production quotas or piece rate work; can have superficial and occasional interactions with the public, peers, and supervisors, meaning no arbitration, confrontation, negotiation, or supervision or commercial driving.

(Tr. 103-04.)  In the "Issues" section of her brief, Ms. Warner-Grunau states she is challenging the ALJ's light RFC.  (ECF Doc. 13, p. 1.)  However, the record makes clear that the ALJ

assessed an RFC with a limited range of sedentary work (Tr. 103-04).  Thus, the question is whether the ALJ's finding that Ms. Warner-Grunau had the RFC to perform a limited range of sedentary work is supported by substantial evidence.

Ms. Warner-Grunau contends that the RFC limitations are not enough, and argues that the ALJ should have included restrictions "to account for limitations in fine and gross hand movements and lifting, carrying, pushing/pulling, as demonstrated by the functional capacity." (ECF Doc. 13, p. 17.)  She also asserts that she experiences "weakness, and abdominal pain, as a result of her medications and removal of her left adrenal gland" and the "the ALJ failed to give any limitation that would account for her being off task or absent at times of migraine."  (*Id*. at pp. 16, 17.)

Consistent with the discussion in Section VI.B, *supra*, the decision reflects that the ALJ considered the record as a whole in assessing Ms. Warner-Grunau's RFC, including her treatment history, objective medical testing, opinion evidence, subjective allegations, and activities of daily living.  Ms. Warner-Grunau's reliance on the findings in the PRFC Assessment to support greater RFC limitations falls short for the same reasons articulated in Section VI.B.

As for her claim that the ALJ should have assigned additional lifting, carrying, and pushing/pulling or manipulative limitations, the ALJ was not required to accept Ms. Warner-Grunau's subjective allegations as true or incorporate them into the RFC.  *See Jones*, 336 F.3d at 476.  The ALJ considered and weighed the entirety of the record, including the opinion evidence, evidence regarding hand cramping and obesity, and activities of daily living which included caring for her dog, driving, preparing quick meals, shopping in store and by computer, and handling personal care (Tr. 102) and concluded that no greater lifting or manipulative restrictions were supported by the record evidence.  There is no indication that the ALJ ignored evidence and

it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence." *Garner*, 745 F.2d at 387.

Ms. Warner-Grunau also contends that the ALJ should have accounted for off task time or absences in the RFC due to her migraines. (ECF Doc. 13, p. 17.)  However, the ALJ did consider her allegations regarding migraines, noting that she reported using a Cefaly unit "'definitely' helped her symptoms." (Tr. 105.)   She also fails to support the need for limitations for off task time or absences.  There is no indication that her asserted use of the Cefaly unit up to one hour each day would take her off task or cause absences from work.

Ms. Warner-Grunau also argues that she experiences weakness and abdominal pain due to her medications and removal of her adrenal gland.  (ECF Doc. 13, p. 16.)  But the ALJ did not ignore evidence related to these conditions and allegations.  Instead, he considered her testimony regarding "persistent abdominal pain and nausea and diarrhea" and found the evidence showed "she frequently denied experiencing such symptoms when seeking treatment and was frequently without abdominal tenderness, distension, masses, rebound, or guarding." (Tr. 105.)   Thus, there is no indication that the ALJ failed to consider evidence relating to her abdominal issues or related symptoms.

In essence, Ms. Warner-Grunau's challenge to the RFC amounts to either a restatement of her challenge to the finding regarding PT Balis' opinion or a request for the Court to consider the evidence *de novo*.  She has not shown that the ALJ's RFC failed to adequately account for the limitations of her physical impairments, or that the ALJ's decision lacks the support of substantial evidence.  She contends that her abilities are more limited than the sedentary RFC formulated by the ALJ, but has failed to demonstrate that the ALJ lacked substantial evidence to support his RFC findings.

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406. A review of the ALJ's decision as a whole reveals that he considered the entirety of the record, including the medical evidence and Ms. Warner-Grunau's subjective reports regarding the severity and frequency of her symptoms.  Because it is not a reviewing court's role to "try the case *de novo*, nor resolve conflicts in evidence," *Garner*, 745 F.2d at 387, this Court cannot overturn the Commissioner's decision "so long as substantial evidence … supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  As explained by the Sixth Circuit:

> [A]t issue in social security cases is not whether [the court] would have reached the same decision on [the] record.  When determining whether to affirm the Commissioner's decision, [the court] need not "agree with the Commissioner's finding"; [the court] instead ask[s] whether the decision followed legal standards and "is substantially supported in the record."

*Bowers, v. Comm'r of Soc. Sec.*, No. 21-4069, 2022 WL 1277703, at *1 (6th Cir. Apr. 29, 2022) (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)).)  Here, although Ms. Warner-Grunau reported significant limitations, she has not met her burden to demonstrate that the ALJ lacked substantial evidence to support his finding that Ms. Warner-Grunau could perform work within the limitations of her assigned RFC.

For the reasons set forth above, the Court finds that Ms. Warner-Grunau has failed to demonstrate that the ALJ's RFC lacks the support of substantial evidence, and accordingly concludes that Ms. Warner-Grunau's second assignment of error is without merit.

### VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision

February 28, 2023

*/s/ Amanda M. Knapp*
_____
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

37